UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CRANSTON/BVT ASSOCIATES :
LIMITED PARTNERSHIP, :
      Plaintiff, :
  :
v. : C.A. No. 13-594S
  :
SLEEPY'S, LLC, :
      Defendant. :

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

      In July 2004, Cranston/BVT Associates Limited Partnership ("BVT") leased to Sleepy's, LLC ("Sleepy's"), a mattress retailer, premises in a retail shopping mall in Cranston, Rhode Island. For the next nine years, BVT and Sleepy's were seemingly contented bedfellows, successfully negotiating three amendments to their lease. The bad dream that culminated in this case began in 2013. With the lease approaching the end of its extended initial term, Sleepy's had serious concerns about continuing in the premises and was determined not to sleep through the deadline for notice of non-renewal. It engaged the landlord, BVT, in negotiations; they exchanged email communications that each paints with a radically different gloss. Sleepy's contends that, by writings set out in these emails, BVT twice agreed to amend the lease, first by extending the time for notice of non-renewal, and then by converting to a month-to-month tenancy so that the parties could continue to negotiate. BVT disagrees; it asserts that the emails are a nullity and that Sleepy's napped past the day for timely notice of non-renewal. Its claims rest on the contention that, while Sleepy's slept, the lease automatically renewed for a new five-year term so that Sleepy's announcement of its intent to get up and leave the premises in August 2013 constituted an anticipatory breach.

BVT's complaint alleges that Sleepy's had to send a written notice of non-renewal by May 30, 2013, and that its failure to do so automatically bound it to the lease until November 30, 2018. Since BVT has failed to find a new tenant, it seeks to have Sleepy's held responsible for the full amount of the rent for the entire five-year term. Sleepy's counterclaims rely on the email exchanges in May and June 2013. It contends that BVT's May 2013 email unambiguously confirmed that the deadline for notice of non-renewal had been extended by thirty-days, which induced Sleepy's to refrain from sending the notice of non-renewal. It claims that BVT's June 2013 email is an unequivocal confirmation of the parties' agreement to shift from a five-year term to month-to-month. It pleads in the alternative that these emails amended the lease, binding BVT; amounted to clear promises, estopping BVT; or constituted conduct waiving BVT's rights. Whether framed as a contract claim or as a claim based in equity, the legal conclusion is the same: Sleepy's was free to terminate the lease in August 2013.

BVT and Sleepy's have both filed motions for summary judgment, which have been referred to me for report and recommendation. BVT argues that the parties' course of dealing establishes that the requirement that a lease amendment must be "reduced to writing and signed by them" means a typewritten document with handwritten signatures of their respective presidents. Accordingly, it contends that the two email exchanges on which Sleepy's relied accomplished nothing. Sleepy's riposte rests on the absence of lease language foreclosing amendment by an electronic writing with an electronic signature. The parties also spar over the authority of the author of the emails, Jay A. Shaw ("Shaw"), Senior Vice President/Director of Leasing for BVT's partial owner (and the manager of the Cranston premises), First Hartford Realty Corp. ("First Hartford"), to agree to and sign a binding amendment.

BVT and Sleepy's each paired its motion with a lengthy list of "undisputed" facts, all of them well-supported by record references. Each party responded to the other's list with disputed facts, virtually all of them equally well-anchored in the record. Over all, of the seventy-six facts presented as "undisputed," only sixteen (or approximately twenty percent) are unchallenged. With a lease whose requirement of a "writing" is sufficiently ambiguous to require interpretation by reference to their course of dealing, with writings purporting to amend the lease that must be amplified by parol evidence to be understood and with conflicting evidence whether the signer of the disputed amendments was authorized or intended to bind BVT, material issues of fact abound. I recommend that both motions be denied.

**I.    FACTS**[1]

    A.    <u>The Lease</u>

In May 2004, the real estate broker for Sleepy's proposed to Shaw, the Senior Vice President/Director of Leasing of First Hartford, that Sleepy's lease retail space in Cranston, Rhode Island, owned by First Hartford's affiliate, BVT.[2] UF ¶¶ 1, 2. The resulting agreement is a detailed commercial lease, typewritten and hand-signed by BVT's president, Neil Ellis, and Sleepy's president, David Acker. UF ¶¶ 2, 43.[3] It was executed on July 22, 2004; as extended by the parties, the end of the initial term was on November 30, 2013. UF ¶¶ 2, 53. It is undisputed that, over the course of the lease, Shaw was always Sleepy's primary contact; as the

---

[1] As indicated in the text, these facts are drawn from the seventy-six paragraphs in the parties' respective statements of Undisputed Facts ("UF ¶ ___") and the corresponding Disputed Facts ("DF ¶ ___"). The first forty-two facts were filed by Sleepy's, while the remainder are BVT's. If a party has disputed only part of a factual statement, and the portion of the fact that I cite to is undisputed, I refer to the fact as UF ¶ ___.

[2] It is undisputed that First Hartford is a partial owner of BVT, as well as the manager of its Cranston real estate. UF ¶ 3. For simplicity, I refer to First Hartford as BVT's affiliate.

[3] The original lease may be found in the record at ECF No. 19-2 at 5. UF ¶ 2. The material amendments preceding the instant dispute are at ECF No. 19-3 at 2 (2007 amendment), ECF No. 19-3 at 11 (2009 amendment) and ECF No. 19-3 at 48 (2011 amendment). UF ¶¶ 6, 7, 11. Except as otherwise indicated, these will be collectively referred to as the "lease."

Senior Vice President/Director of Leasing at First Hartford, the parties agree that he managed the property for BVT and that most of Sleepy's communications with its landlord about the lease were with him. UF ¶ 4. However, the parties disagree vigorously over whether Shaw was authorized (or had apparent authority) to agree to or sign a binding amendment to the lease. DF ¶ 48.

Several of the lease provisions (and several of the matters on which it is silent) are material to this dispute. First, BVT highlights the language on how to amend the lease:

> No subsequent alteration, amendment, change or addition to this lease shall be binding upon landlord or tenant unless *reduced to writing and signed by them*.

UF ¶¶ 5, 45 (Lease § 15.13) (emphasis supplied). Sleepy's emphasizes that this provision of the lease does not define what may constitute a "writing" or what action is sufficient to satisfy the requirement that the writing be "signed by them." Specifically, it notes that the lease does not say that an email is not a "writing" and does not preclude the use of electronic signatures. Sleepy's contends that the Rhode Island Uniform Electronic Transactions Act, R.I. Gen. Laws § 42-127.1-1, *et seq.*, fills the void – this 2000 enactment provides that, unless the parties agree otherwise, "[a] record or signature may not be denied legal effect or enforceability solely because it is in electronic form." R.I. Gen. Laws §§ 42-127.1-5(a)-(b), 7(a).

Second, BVT cites to the definition of "landlord," which makes clear that it, and not First Hartford, is the party to the lease. UF ¶ 43 (Lease § 1.16). BVT couples its status as landlord with the provision stating that any notice "shall be deemed duly given . . . if forwarded" to the landlord by traditional mail sent to BVT's president, Neil Ellis, with a copy to BVT's attorney, Jeffrey Carlson. UF ¶ 44 (Lease ¶ 15.1). From this language, BVT concludes that only its president had the authority to agree to sign a binding amendment to the lease. Sleepy's counters that the lease does not say that a writing mailed to BVT's president is the only way to give

4

notice; it simply provides that, by use of the method set out in the lease, notice is "deemed duly given." And the lease does not define who is authorized by BVT to sign a binding writing; therefore, it does not preclude Shaw, who was employed by BVT's affiliate, First Hartford, from being authorized to agree to and sign lease amendments.

Finally, while it is an integrated agreement ("This Lease . . . set[s] forth all the covenants, promises, agreements, conditions and understanding between Landlord and Tenant concerning the Leased Premises"), UF ¶ 45 (Lease ¶ 15.13), there is no clause stating that the parties cannot, by their conduct, impliedly waive any of their rights under the lease.

B.  Pre-2013 Course of Dealing

In laying out the relevant course of dealing,[4] both parties point to the "First Amendment to Lease" dated November 20, 2007, as the first landmark. UF ¶ 6. It memorialized Sleepy's move to larger space, altered the rent, extended the initial lease term to November 30, 2013, and created the option for two automatic renewal terms of five years each. UF ¶¶ 6, 51, 53, 54. To avoid automatic renewal, it required Sleepy's to give "at least six (6) months prior written notice to the Landlord;" for the initial term ending November 30, 2013, the parties agree that the notice of non-renewal was due on May 30, 2013. UF ¶¶ 6, 12. The "First Amendment to Lease" was prepared as a formal typewritten document hand-signed by the presidents of BVT and Sleepy's. UF ¶ 50.

The next change of significance to the lease is memorialized in a letter dated January 13, 2009; it reduced the rent for a limited period and waived a clause that allowed for early termination. UF ¶ 7. While it is a typewritten document, it is printed on First Hartford (not

---

[4] BVT presents additional evidence of the parties' course of dealing in connection with other leases for other premises. UF ¶¶ 63, 64. Sleepy's cries foul, arguing that these dealings are far too remote from the lease at issue to be relevant. DF ¶¶ 63, 64. This is a dispute to be resolved by the trial judge. Since the course of dealing evidence on the lease at issue is ambiguous, there is no need to decide where to draw the relevancy boundary during the summary judgment phase of the case.

5

BVT) letterhead, purports to be signed by Shaw, who is identified below his signature as "Senior Vice President/Director of Leasing," and was transmitted to Sleepy's electronically, by facsimile. UF ¶ 7; ECF No. 12-1 at 2-3. The text of the letter confirms a conversation between Sleepy's president and Shaw (not BVT's president); it makes clear that it purports to be an amendment to the lease, binding on BVT. Id. BVT denies that Shaw actually signed this amendment; it points to testimony establishing that Ellis, as president of BVT, instructed his administrative assistant to sign Shaw's name. DF ¶ 7.

The last material amendment was concluded in June 2011 and relates to Sleepy's name change. UF ¶ 11. As was customary, during the negotiations, Sleepy's acted through its president, while BVT acted through Shaw. UF ¶ 8. Two aspects of this amendment are significant. First, the parties reached agreement in email communications exchanged on May 17 and 18, 2011. UF ¶ 9. Several weeks later, on June 9, 2011, Shaw emailed a scanned copy of a letter dated June 9, 2011, on Sleepy's letterhead, prepared by BVT's attorney and signed (by hand) by BVT's president. UF ¶¶ 10, 11. In language whose meaning the parties hotly dispute, the letter states, "electronic signatures shall be deemed original signatures." ECF No. 19-3 at 49. Sleepy's interprets this phrase as confirmation that electronic signatures may substitute for handwritten signatures in all of the parties' dealings, while BVT contends that, read in context and in light of the parties' course of dealing, it plainly applies only to the June 9, 2011 letter. DF ¶ 11.

      C.     <u>Extension of Deadline for Notice to Terminate</u>

With this ambiguous course of dealing in the background, the lease approached the end of its initial term and the critical deadline for notice of non-renewal. With that very much in mind, beginning on May 7, and again on May 10, 2013, Sleepy's claims that its president spoke

to Shaw by phone regarding Sleepy's concerns about renewing the lease because of its dissatisfaction with the rent and the size of the premises. UF ¶¶ 13, 14; DF ¶¶ 13, 14. Sleepy's witnesses testify that, during these conversations, to induce Sleepy's not to give notice of non-renewal, Shaw promised that BVT would extend the non-renewal notice deadline from May 30 to June 30, 2013. UF ¶ 15. BVT agrees that Sleepy's president and Shaw talked several times, but its version of the substance of these communications is very different. It claims that the only topic discussed was Sleepy's desire to reduce the leased space. DF ¶¶ 13, 14. Shaw himself denied that he agreed to extend the notice of non-renewal deadline. DF ¶ 15. BVT claims that Shaw lacked the authority to make such a promise. DF ¶ 15; UF ¶ 48.

On May 29, 2013, with the non-renewal deadline looming, Sleepy's became concerned about the need to memorialize the promise to extend it believed Shaw had made on behalf of BVT. As a result, Sleepy's president, Acker, instructed his Executive Assistant, Rita Pendergast, to demand written confirmation by an email that she sent to Shaw at 2:36 p.m.:

> Jay, As per your conversation with David Acker this email is to confirm the extension of notice period for [the Cranston premises] to June 30, 2013. Please confirm.

UF ¶ 17. Shaw acknowledges that he received her email, and admits that he responded at 9:03 a.m., the morning of the deadline, May 30, 2013, as follows:

> Rita
> Documentation to follow from David Burns in legal . . .
> Jay.

UF ¶ 18; ECF No. 19-3 at 52. Sleepy's claims it was satisfied with this email, particularly when read in the context of the conversations it claims occurred between its president and Shaw, and relied on the email as sufficient to amend the lease by extending the non-renewal deadline. UF ¶¶ 18, 20. Induced by the email, Sleepy's says it refrained from sending the notice of non-

7

renewal but continued to negotiate. UF ¶ 20. No documentation was ever received from "David Burns in legal." UF ¶ 66.

BVT disputes virtually every fact supporting the conclusion that Shaw's May 30, 2013, email constituted a writing signed by BVT amending the lease, promising to amend the lease or waiving the non-renewal notice deadline. In addition to denying that extending the non-renewal deadline was discussed or agreed to in the predicate conversations on May 7 and May 10, DF ¶¶ 13-15, it points out that the email is at best ambiguous in that it does not mention the extension and lacks a true electronic signature in that "Jay" is not enough. DF ¶¶ 18, 20. BVT also points to Shaw's lack of authority to agree to an extension of the non-renewal notice deadline. DF ¶ 17; UF ¶ 48. BVT makes no attempt to explain what Shaw meant by the May 30, 2013, email.

D. <u>Month-to-Month Tenancy</u>

With Sleepy's (as it claims) believing that the non-renewal notice deadline had been reset to June 30, 2013, and with BVT (as it claims) believing the lease had already automatically renewed for five more years, the parties continued their negotiations. As with their May negotiations, they do not agree about much that happened in June 2013.

It is undisputed that Sleepy's president met with Shaw in Sleepy's offices on June 3. UF ¶ 23. In Sleepy's version, the negotiations resumed at the meeting, where consistent with its belief that its option to give notice of non-renewal remained available, Sleepy's claims that they talked about Sleepy's concern over the increased rent if the lease renewed while BVT raised its concern over getting a long term tenant for the space. UF ¶¶ 24-25. As June unfolded without resolution of these issues, Sleepy's claims that the discussions between its president and Shaw began to focus on the possibility of amending the lease by creating a month-to-month tenancy terminable by either party on thirty days' notice. UF ¶¶ 26, 27. In Sleepy's version, these

conversations culminated in Shaw's agreement, this time to the month-to-month arrangement. UF ¶ 28.

By June 25, 2013, with five days left to exercise its non-renewal option, Sleepy's alleges that it again became concerned about the need to memorialize this critical agreement. As before, its president, Acker, assigned his Executive Assistant, Pendergast, the task of procuring written confirmation. The parties agree that she initiated the process by an email sent to Lois Crawford at First Hartford[5] stating: "Please confirm that we agree to amend our obligations at [Cranston] on a month to month basis." UF ¶ 29. After two days of silence, on June 27, 2013, Pendergast sent a second email to Crawford, with a copy to Shaw. This time she was crisp and clear:

> Can you please confirm this via email? Our notice is due on Sunday, otherwise I will have to send the notice today. Email confirmation will work for us."

UF ¶ 30. The next morning (June 28, 2013), Sleepy's claims that Pendergast called and talked directly to Shaw about the shift of the lease to month-to-month; Sleepy's alleges that Shaw gave Pendergast "his word" that the parties had an agreement to switch to month-to-month and told her that BVT's attorney would send confirmation. UF ¶ 31. When nothing arrived, at 11:24 a.m., she emailed Crawford with a copy to Shaw, stating, "Jay, we still have not received anything. Please confirm via email." UF ¶ 32. The parties do not dispute that, at 1:48 p.m., Shaw himself responded in a critical email:

> Rita
> The month to month lease status for Cranston . . . is confirmed.
> Jay A. Shaw

UF ¶ 33. Sleepy's points to an internal BVT memorandum from Shaw to BVT's president as confirmation of its interpretation of these communications; while most of it is redacted, the final entry on the memorandum states, "Sleepy's. Month to month leases for Cranston." UF ¶ 38.

---
[5] Lois Crawford is the receptionist at First Hartford (ECF No. 24-4 at 3).

Apart from admitting that the emails on which Sleepy's relies are authentic and were sent and received as it alleges, BVT provides a significantly different account of the events in June 2013. First, it denies that there was any discussion of a month-to-month tenancy or of its need to find any other long-term tenant during the June 3 meeting. DF ¶¶ 24, 25, 31. BVT denies that Shaw committed to the month-to-month agreement because he lacked the authority to do so; it points to the testimony of its president that he is the person with authority to bind BVT, that he did not authorize Shaw to make such an agreement and that he knew nothing about shifting to a month-to-month tenancy. DF ¶¶ 28, 34. Finally, despite Shaw's testimony at one point during his deposition that the June 28, 2013, email was sent in good faith with the intent that Sleepy's would rely on it, Shaw also testified that the email has been taken out of context and that he cannot recall whether his intent was to induce reliance. DF ¶ 35; ECF No. 24-4 at 4-6. Shaw explains away the July 1, 2013, internal memorandum: "it's just some typing that I put in and didn't complete . . . just notes that I started to write and then stopped." DF ¶ 38.

It is undisputed that Sleepy's did not issue a notice of non-renewal by the June 30, 2013 deadline; Sleepy's claims it refrained in reliance on Shaw's June 28, 2013 email. UF ¶ 36. BVT disagrees. DF ¶ 36

E. Alleged Breach

BVT finally woke up on July 8, 2013 – for the first time, it affirmed its interpretation of events, sending Sleepy's a letter stating:

> [T]he Tenant has not provided the Landlord with 6 months' advance written notice to elect to permit the Lease term [to] expire on November 30, 2013 . . . This deadline for this notice was May 30, 2013. As such, the Lease term will be extended until November 30, 2018 . . .

UF ¶ 39; DF ¶ 39; ECF No. 19-3 at 64. This letter drew a quick response. On July 16, 2013, Sleepy's exercised its right, per its interpretation of the lease, and gave notice of intent to

terminate the lease in thirty days. UF ¶ 40. Anticipating that it would be unable to rent the premises, BVT initiated this suit on August 16, 2013. On August 28, 2013, Sleepy's confirmed that it had vacated the premises. UF ¶ 41.

## II. Law

### A. Summary Judgment Standard

Under Fed. R. Civ. P. 56, summary judgment is appropriate if the pleadings, the discovery, disclosure materials and any affidavits show that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009); Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 37 (1st Cir. 2006) (quoting Fed. R. Civ. P. 56(c)). A fact is material only if it possesses the capacity to sway the outcome of the litigation; a dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The evidence must be in a form that permits the court to conclude that it will be admissible at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000) (citing Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996)).

"Cross-motions for summary judgment do not alter the basic rule 56 standard, but rather simply require [this Court] to determine whether either of the parties deserves judgment as a

11

matter of law on facts that are not disputed." Adria Int'l Grp. Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).

### III. Analysis

#### A. Sleepy's Contractual Claims

Sleepy's contends that the undisputed facts establish that Shaw's emails of May 30 and June 27, 2013, constitute electronically signed writings that are binding on BVT and that amended the lease, first by extending the date for notice of non-renewal and then by changing the term to month-to-month. To persuade this Court to look past the morass of factual disputes and to enter summary judgment in its favor, Sleepy's must demonstrate that there is no genuine issue as to each of the material facts on which this conclusion rests. These include that the emails constitute a "writing," which the lease requires for an effective amendment, that Shaw both had the authority to sign on behalf of BVT and that he electronically signed each email, and that the meaning of the emails is so clear that there is no need to refer to disputed oral communications.

The first operative fact – that each of the emails constitutes a "writing" as that term is meant by the lease provision requiring an amendment to be "reduced to writing" – is hotly disputed by BVT, which contends that the parties' course of dealing established that "writings" must be typewritten and hand-signed. For example, BVT contends that every amendment was ultimately reduced to a typewritten document with a handwritten signature, while Sleepy's points to the 2011 amendment, when the agreement was reached in an email exchange confirmed by a later writing that was transmitted by email. It also notes that the critical June 27 email from Shaw was in response to Sleepy's email expressly stating that "[e]mail confirmation works for us." Shaw's response did not contradict this assertion.

12

Sleepy's argues that the disputes regarding this plainly material fact are irrelevant. Pointing to the Rhode Island Uniform Electronic Transactions Act and specifically R.I. Gen. Laws § 42-127.1-7(a), which provides that a record or signature may not be denied legal effect or enforceability solely because it is in electronic form, Sleepy's contends that the lease does not define the form that a writing must take and that this Rhode Island statute fills in the interpretative gap. Thus, it contends, the lease, read in tandem with R.I. Gen. Laws § 42-127.1-7(a), must be interpreted to include email as an acceptable "writing" to amend the lease as a matter of law.

The flaw in this argument is exposed by another provision in the Rhode Island Uniform Electronic Transactions Act. R.I. Gen. Laws § 42-127.1-5(b) expressly provides that "[w]hether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." When the context, surrounding circumstances and prior course of conduct are susceptible of more than one interpretation, as they are here, whether or not an email constitutes a "writing," as the term is used in this lease, is fraught with ambiguity. See T.G. Plastics Trading Co. Inc. v. Toray Plastics (Am.), Inc., 958 F. Supp. 2d 315, 323-24 (D.R.I. 2013) (trial required when agreement susceptible of more than one interpretation, in light of lack of clarity in four corners of contract and opposing extrinsic evidence). Accordingly, summary judgment is precluded. Id.

The second fact – Shaw's authority to sign an amendment to the lease – is equally material and just as hotly disputed. Under Rhode Island law, "[a]n agent's apparent authority to contract on behalf of his [or her] principal arises from the principal's manifestation of such authority to the party with whom the agent contracts." Menard & Co. Masonry Bldg. Contractors v. Marshall Bldg. Sys., Inc., 539 A.2d 523, 526 (R.I. 1988) (citing Restatement

13

(Second) Agency § 8 (1958)). The principal is not required directly to communicate the agent's authority to the third party; the information received by the third party may come from "other indicia" given by the principal to the agent. Id. The third party must reasonably believe that the agent has the authority to bind its principal to the contract. Haviland v. Simmons, 45 A.3d 1246, 1260 (R.I. 2012) (citing Restatement (Second) Agency § 8 cmt. a).

BVT contends that Shaw was not employed by BVT and points to Shaw's testimony that he lacked authority to sign amendments. Sleepy's contends that his role as the manager of the relationship and the person with whom they almost always dealt establishes his authority. Both parties point to the 2009 amendment; it appears to be signed by Shaw (supporting Sleepy's contention of apparent authority) but BVT's president testified it was actually signed by an administrative assistant acting under his direction (supporting BVT's contention that only its president had authority to sign a binding amendment). Of course, the fact that BVT's president instructed his assistant to sign Shaw's name, rather than his own, is also evidence that a fact finder could rely on to conclude that Shaw did have apparent authority, at least at the time of the 2009 amendment. See 731 Airport Assocs. v. H & M Realty Assocs., LLC, 799 A.2d 279, 283 (R.I. 2002) ("indicia of authority given by the principal to the agent" clothes agent with apparent authority). These facts frame a genuine dispute regarding the material issue of Shaw's authority to sign an amendment to the lease. See Blackstone Canal Nat'l Bank of Providence v. Indus. Trust Co., 19 A.2d 252, 253 (R.I. 1941) ("[a]n agent's real or apparent authority is ordinarily one of fact to be determined from all the circumstances in evidence"). It is not susceptible of summary judgment. See Lowell Hous. Auth. v. PSC Intern., Inc., 692 F. Supp. 2d 180, 190 (D. Mass. 2010 (where defendant told to deal with individual who signed and never told he lacked authority, apparent authority is disputed fact, precluding summary judgment).

The third leg of Sleepy's argument that the lease was amended rests on the adequacy of the electronic signature on each of the critical emails. The first is "signed" by Shaw using only his first name, "Jay," while the second closes with "Jay A. Shaw," but contains no symbols or marks that unequivocally indicate a signature. Shaw himself denies that he acted with intent to issue a binding amendment. DF ¶¶ 18-20, 28.[6] For the name on the email to qualify as a "signature," it must be undisputed that Shaw intended it as a signature. R.I. Gen. Laws § 42-127.1-2(8); see, e.g., In re Rhee, 481 B.R. 880, 894 (Bankr. S.D. Tex. 2012) ("For an electronic signature to be valid, it must be executed or adopted by a person with the intent to sign the record."). A legion of cases hold that, when the "signer" denies that he acted with the intent to sign, whether a typed name at the end of an email communication amounts to a "signature" is a factual issue precluding summary judgment. See, e.g., Pepco Energy Servs., Inc. v. Geiringer, No. CV07-4809 (WDW), 2010 WL 318284, at *2 (E.D.N.Y. Jan. 21, 2010) (summary judgment denied where signature in email was simply typed name and evidence on intent to sign disputed); Roger Edwards, LLC v. Fiddes & Son, Ltd., 245 F. Supp. 2d 251, 261 (D. Me. 2003) (whether email signature is binding turns on facts establishing intent to bind; summary judgment denied); SN4, LLC v. Anchor Bank, 848 N.W.2d 559, 568 (Minn. Ct. App. 2014) (typed name in email can constitute signature, but whether it is intended as signature is question of fact). They demonstrate that this too is a material factual dispute to be resolved by a fact finder.

Permeating all of these facts are issues of credibility; a quick look at a few of the testimonial snippets presented by the parties makes plain that credibility determinations will be needed to untangle this factual thicket. To illustrate, Shaw's testimony is soft as a pillow on the critical facts underpinning his May 30, 2013, email. At one point, he testified that he sent the

---

[6] Shaw testified that he did not have authority to issue a binding amendment, but also said that he cannot remember whether he intended Sleepy's to rely on his second email. ECF No. 24-4 at 4-5, 13.

email to induce Sleepy's to rely; inconsistently, in the same deposition, he testified that it was not his intent either to induce reliance or to prevent Sleepy's from sending the notice of non-renewal. ECF Nos. 19-2 at 79; 24-4 at 16. Similarly, only a factfinder can square Shaw's denial that he had the authority to promise to extend the non-renewal notice deadline with his admission that he spoke to BVT's president and attorney before he sent the email, followed by his refusal to answer (invoking advice of counsel) when asked whether he believed he had been authorized to send it. DF ¶19; ECF No. 19-2 at 85-88. It also will require a fact finder to determine the significance of Shaw's testimony that he would not have sent such an email without the approval of BVT's president and his claim that he could not remember whether he had that approval. ECF Nos. 19-2 at 85, 94; 24-4 at 14-15.

Finally, Sleepy's summary judgment argument ignores the ambiguity inherent in the language of the emails on which it relies. While Sleepy's email to Shaw in May 2013 is crisp and clear in asking for confirmation that the notice period was extended to June 30, Shaw did not respond with an unambiguous "confirmed;" rather he wrote, "[d]ocumentation to follow by David Burns in legal." With nothing from "legal," the oral communications surrounding this enigmatic email are essential to evaluate whether it has the legal effect Sleepy's ascribes to it. Similarly, while the June 2013 email exchange seems unequivocal in confirming "month to month lease status," UF ¶ 33, it nevertheless lacks any details to flesh out the content of a month-to-month arrangement. For example, it is ambiguous with respect to whether the month-to-month term was to begin immediately or whether it would commence at the termination of the initial term on November 30, 2013. Accordingly, the hotly disputed oral communications culminating in this email are essential to a determination whether it amounts to a binding

amendment that permitted Sleepy's to terminate the lease and vacate the premises in August 2013.

All in all, factual disputes complicate the proof of every one of these material facts, precluding summary judgment on Sleepy's contract-based claims.

B. <u>Sleepy's Equitable Claims – Promissory Estoppel and Waiver</u>

Sleepy's motion does not rest only on the formation of a binding contract. It relies in the alternative on the doctrine of promissory estoppel, arguing that the Shaw emails amounted to clear and unambiguous promises on which it relied to its detriment. It contends that the facts establishing each element of promissory estoppel are all undisputed. Relatedly, it argues that the undisputed evidence establishes that BVT has impliedly waived its right to claim that the lease required more than the Shaw emails to effect a binding amendment.

Under Rhode Island law, the doctrine of promissory estoppel permits recovery based on a "promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." <u>Alix v. Alix</u>, 497 A.2d 18, 21 (R.I. 1985) (quoting <u>Restatement (Second) Contracts</u> § 90 (1981)). To establish promissory estoppel, the claimant must prove 1) a clear and unambiguous promise by the promisor, 2) reasonable and justifiable reliance upon the promise, and 3) detriment to the promisee caused by reliance on the promise. <u>Filippi v. Filippi</u>, 818 A.2d 608, 625-26 (R.I. 2003). Rhode Island courts have held that "when a necessary element of a contract is lacking as a result of one contracting party's failure to act, the benefiting party cannot then assert that the contract is invalid to avoid fulfilling their obligation under the contract." <u>Id.</u> at 626 (internal citation omitted).

17

The equitable doctrine of waiver is similar – it requires proof of "voluntary, intentional relinquishment of a known right." Sturbridge Home Builders, Inc. v. Downing Seaport, Inc., 890 A.2d 58, 65 (R.I. 2005). "The '[i]mplied waiver of a legal right must be proved by a clear, unequivocal, and decisive act of the party who is alleged to have committed waiver.'" Id. (quoting Ryder v. Bank of Hickory Hills, 585 N.E. 2d 46, 49 (Ill. 1991)). Rhode Island courts have considered "the expectations of 'a reasonable person in [the contracting party's] position,' in light of the prior course of dealing and past history between the parties." State v. Breen, 767 A.2d 50, 58 (R.I. 2001) (citing Kenney Mfg. Co. v. Starkweather & Shepley, Inc., 643 A.2d 203, 209 (R.I. 1994)).

Disputes permeate the facts that are material to Sleepy's promissory estoppel and waiver theories. First, Shaw's authority to make a promise or waive a right is a material fact that is hotly disputed. Moreover, Shaw testified that the discussions preceding the pivotal emails contradict the promises that Sleepy's contends the emails plainly memorialize. This testimony means that Shaw's credibility will be pivotal. Whether Sleepy's can prove the existence of a promise that is clear and unambiguous, or a waiver that amounts to an unequivocal and intentional relinquishment of a right by BVT will depend on the prior course of dealing and past history between the parties. Filippi, 818 A.2d at 626; Breen, 767 A.2d at 58. This is not susceptible of summary judgment.

C.  BVT's Contractual Claim

BVT's counter motion for summary judgment is even more unavailing. It contends, somewhat illogically, that the parties' ambiguous course of dealing undisputedly establishes an agreement that amendments to the lease must be typewritten and hand-signed. With this unwritten clarification of the lease based on the course of dealing, BVT posits that the first email,

18

the one Shaw sent on May 30, 2013, is insufficient to bind it as a matter of law. By treating the May 30 email as a nullity, BVT contends that the lease renewed for a new five-year term and it is entitled to the rent for the entire term, less any amounts it may earn from a new tenant in mitigation.

To support this argument, BVT turns to cases requiring strict compliance with the renewal terms in an agreement. See Elena Carcieri Trust-1988 v. Enterprise Rent-A-Car, 871 A.2d 944, 949 (R.I. 2005); Dyer v. Ryder Student Transp. Servs., Inc., 765 A.2d 858, 861 (R.I. 2001). BVT's reliance on these cases is misplaced. They feature renewal provisions found to be unambiguous. While the lease here has an analogous renewal requirement that a binding amendment must be "reduced to writing and signed by them," the facts laid out by BVT and Sleepy's expose that, in this lease, that requirement is ambiguous with respect to whether an email is a writing and whether a name printed in an email is a signature. See Elena Carcierci Trust-1988, 871 A.2d at 946-48 (if ambiguity exists, court may consider construction placed on contract terms by parties). BVT's reliance on Fondedile, S.A. v. C.E. Maguire, Inc., 610 A.2d 87, 91 (R.I. 1992) is equally unhelpful. Fondedile does not involve summary disposition, but rather is based on findings of fact rejecting an oral modification to an agreement expressly requiring a writing because the party claiming oral modification failed to prove waiver. Id. at 92. Sleepy's does not rely on an oral modification, but rather on a writing sent (and perhaps signed) by the same individual whose name was used by BVT to sign a prior amendment – the issue is whether it was sufficient to alter the lease. On that key point, the factual disputes preclude summary judgment.

**IV.    CONCLUSION**

Based on the foregoing, I recommend that both Sleepy's Motion for Summary Judgment (ECF No. 18) and BVT's Cross Motion for Summary Judgment (ECF No. 22) be denied.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
January 21, 2015