UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                    )
CRANSTON/BVT ASSOCIATES,            )
LIMITED PARTNERSHIP,                )
                                    )
          Plaintiff,                )
                                    )       C.A. No. 13-594 S
     v.                             )
                                    )
SLEEPY'S, LLC,                      )
                                    )
          Defendant.                )
_____)
```

**OPINION AND ORDER**

WILLIAM E. SMITH, Chief Judge.

In July 2004, Cranston/BVT Associates Limited Partnership ("BVT") leased a retail store in Cranston, Rhode Island to Sleepy's LLC ("Sleepy's"), a mattress retailer. For nine years, working primarily through Jay Shaw, the Senior Vice President and Director of Leasing at First Hartford Realty Corporation ("First Hartford"), an affiliate of BVT, the landlord and tenant had an amicable relationship. The parties' relationship, however, began to sour in May 2013, as the Lease approached the end of its term. The Lease required Sleepy's to notify BVT by May 30, 2013 if it did not want to renew, otherwise, the Lease would automatically renew for five years. Faced with this deadline, Sleepy's reached out to Shaw to negotiate changes to the Lease. The communications Sleepy's had with Shaw during

these negotiations form the core of this dispute. Sleepy's argues, under both contract and promissory estoppel theories, that these communications extended the Lease's nonrenewal notice deadline and then converted the Lease to a month-to-month tenancy. BVT disagrees, arguing that it never agreed to amend the Lease. Thus, according to BVT, since Sleepy's missed the May 30, 2013 notice deadline, the Lease automatically renewed for five additional years.

The parties tried the case before the Court without a jury on December 21-22, 2015. Having considered the evidence presented at trial and the pre-trial and post-trial memoranda submitted by the parties, the Court makes the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(a).

I.   Findings of Fact

1.   In 2004, Jay Shaw, Senior Vice President and Director of Leasing at First Hartford, an affiliate of BVT, solicited Sleepy's to lease retail space in Cranston, RI that was owned by BVT. (Trial Tr. vol. 2, 10:16-11:3, Dec. 22, 2015, ECF No. 75; see Trial Ex. 28, p. 53.)

2.   As a result of Shaw's solicitation, Shaw received an offer from Sleepy's on May 21, 2004 to lease space at the Cranston Parkade.   (Trial Ex. 1; Trial Tr. vol. 2, 10:19-21, Dec. 22, 2015, ECF No. 75.)

3.    On July 22, 2004, BVT and Sleepy's entered into a type-written lease agreement ("Lease") for retail space at 200 Garfield Avenue, Cranston, RI (the "Property" or "Premises"). (Trial Ex. 2; Trial Tr. vol. 1, 11:3-10, Dec. 21, 2015, ECF No. 74.)

4.    David Acker, Sleepy's owner and president, signed the Lease on behalf of Sleepy's.  (Trial Tr. vol. 2, 64:8-10, Dec. 22, 2015, ECF No. 75; Trial Ex. 2.)

5.    Neil Ellis, BVT and First Hartford's president, signed the Lease on behalf of BVT.  (Trial Tr. vol. 1, 5:16-24, Dec. 22, 2015, ECF No. 74; Trial Ex. 2.)

6.    At all times relevant, Shaw was Sleepy's primary contact with regard to the Property.  (Trial Tr. vol. 1, 47:2-7, Dec. 21, 2015, ECF No. 74; Trial Tr. vol. 2, 24:22-23, Dec. 22, 2015, ECF No. 75.)    He was responsible for "[o]ngoing negotiations" and "helping to resolve disputes."   (Trial Tr. vol. 2, 10:22-11:1, Dec. 22, 2015, ECF No. 75.)

7.    Shaw received his title, Senior Vice President and Director of Leasing at First Hartford, to give him "credibility with new tenants and marketing of the projects."   (Trial Tr. vol. 2, 10:6-12, Dec. 22, 2015, ECF No. 75.)

8.    In Acker's interactions with Shaw, Shaw always delivered on the oral agreements they reached during

negotiations.  (Trial Tr. vol. 2, 121:8-10, Dec. 22, 2015, ECF
No. 75.)

    9.   The Lease set forth requirements for Sleepy's when
sending notices regarding the Lease to BVT.  This provision,
"Section 15.1 Notices from Tenant to Landlord," states

> Any notice from Tenant to Landlord shall be deemed
> duly given on the date delivered or rejected if
> forwarded to the accepted or rejected [sic] by
> Landlord at the address hereinbelow [sic] set forth by
> registered or certified mail, return receipt
> requested, or by express mail.  Landlord's original
> address:
>
> 149 Colonial Road
> P.O. Box 1270
> Manchester, CT 06045-1270
> Attn: Neil H. Ellis
> cc: Jeffrey M. Carlson, Esq.

(Trial Ex. 2, § 15.1.)

    10.  Section 15.13, titled "Exhibits," provides in relevant
part that "[n]o subsequent alteration, amendment, change or
addition to this Lease shall be binding upon Landlord or Tenant
unless reduced to writing and signed by them." ("Modification
Provision").  (Trial Ex. 2, § 15.13.)

    11.  Prior to May 2013, the parties made changes to the
Lease on at least four occasions.

    12.  The first change took effect on November 20, 2007.
(Trial Ex. 3.)  The amendment itself was type-written on a
document titled "First Amendment to Lease." (Id.)  It was hand-

4

signed by Acker on behalf of Sleepy's and Ellis on behalf of BVT. (Id.)

13. Among other things, the first amendment allowed Sleepy's to move to a larger space at the Cranston shopping center. (Id.) It also extended the initial Lease term to November 30, 2013 (the "Initial Term") and gave Sleepy's the option to renew the Lease for two consecutive five-year terms (each a "Renewal Term"). (Id.) Each option to renew the Lease for a Renewal Term would be automatically exercised unless Sleepy's sent notice of its intention not to renew the Lease ("Nonrenewal Notice" or "Notice") at least six months prior to the end of the Initial Term or the then current Renewal Term, as applicable. (Id.)

14. Sleepy's had no obligation to renew the Lease, but if it wanted to exercise its nonrenewal option, it had to send BVT the Nonrenewal Notice by the May 30, 2013 deadline. (Trial Tr. vol. 1, 30:14-19, Dec. 21, 2015, ECF No. 74; Trial Tr. vol. 2, 112:22-113:8, Dec. 22, 2015, ECF No. 75.)

15. The next change to the Lease occurred on January 13, 2009. Prior to that date, in November 2008, Acker communicated with Shaw about reducing Sleepy's rent for the retail space. (Trial Tr. vol. 2, 101:19-102:4, Dec. 22, 2015, ECF No. 75; Trial Ex. 5.) Ellis remembers also discussing the rent issue with Acker. (Trial Tr. vol 1, 21:13-21, Dec. 21, 2015, ECF No.

74.)  Acker, however, recalls negotiating the issue only with Shaw.  (Trial Tr. vol. 2, 102:5-24, Dec. 22, 2015, ECF No. 75.)

16.  The negotiations culminated with a January 13, 2009 letter on First Hartford letterhead in which, among other things, BVT agreed to reduce Sleepy's rent by ten percent for a period of six months.  (Trial Ex. 6.)  In exchange, Sleepy's agreed to waive the "kick out" clauses of various leases it had with BVT.  (Id.)[1]

17.  The letter was signed on behalf of First Hartford and BVT by "Jay A. Shaw / [illegible initials]."  (Id.)  Under Shaw's signature was typed "Jay A. Shaw, Senior Vice President/Director of Leasing."  (Id.)  Acker signed the letter on behalf of Sleepy's.  (Id.)  Ellis claims that he directed his secretary to sign Shaw's name on the letter.  (Trial Tr. vol 1, 20:18-21:10, Dec. 21, 2015, ECF No. 74.)  Acker, however, worked with Shaw on the terms memorialized in the letter and had no knowledge of Shaw's discussions or interactions with others at BVT.  (Trial Tr. vol 2, 102:20-103:9, Dec. 22, 2015, ECF No. 75.)

---

[1]  In commercial leases, "kick out" clauses, generally, allow a tenant to terminate a lease before the expiration of the term if the tenant fails to meet certain sales thresholds.  As Acker stated, by waiving these provisions in the Lease, Sleepy's was extending its commitment at the Premises.  (Trial Tr. vol. 2, 104:11-15, Dec. 22, 2015, ECF No. 75; Trial Ex. 6.)

18.   The parties transmitted the letters to each other via facsimile.   (Trial Ex. 6; Trial Tr. vol. 1, 60:16-17, Dec. 21, 2015, ECF No. 74; Trial Tr. vol. 2, 103:21-104:1, Dec. 22, 2015, ECF No. 75.)

19.   The third change to the Lease occurred in June 2011. Acker and Shaw communicated via email regarding a proposed amendment to section 9.1.2 of the Lease that would change Sleepy's name to 1800Mattress.   (Trial Ex. 8.)

20.   Ultimately, Sleepy's drafted a letter agreement, which stipulated that if BVT agreed to its terms BVT should "sign this letter agreement where indicated below and return a fully executed original letter agreement to [Sleepy's] by facsimile . . . and by regular mail.   Facsimile or electronic signatures shall be deemed original signatures."   (Trial Exs. 9, 38.)

21.   The parties executed the agreement on June 9, 2011. (Id.)   Ellis signed for BVT; Acker signed for Sleepy's.   (Id.) BVT's in-house counsel, David Burns, indicated in an email to Shaw that Burns had faxed a copy of the executed agreement to Sleepy's.   (Trial Ex. 38.)   Burns asked Shaw to send a scanned copy of the agreement to Sleepy's as well.   (Id.)   Shaw complied with this request and forwarded Sleepy's a copy via email. (Id.; see Trial Tr. vol. 1, 69:13-17, Dec. 21, 2015, ECF No. 74.)   BVT maintained a paper copy of the agreement with original

signatures in its files.   (Trial Tr. vol. 1, 23:22-24:17, Dec. 21, 2015, ECF No. 74.)

22.   Finally, on January 31, 2012, First Hartford sent a letter to Sleepy's, addressed generally to "Tenant," allowing Sleepy's to change the name on the Lease from "1800Mattress" back to "Sleepy's."   (Trial Ex. 10.)   Ellis signed the letter for BVT and copied Shaw via email.   (Id.)   The letter did not, however, contain a signature line for Acker, and neither Acker, nor anyone else at Sleepy's signed the letter.   (Id.)

23.   BVT also introduced leases, and amendments to the leases, for other retail stores Sleepy's leased from affiliates of BVT.   (Trial Tr. vol. 1, 60:16-17, Dec. 21, 2015, ECF No. 74.)   The leases for these buildings were the same as the Lease at issue in this action and contained the same modification provision.   (Trial Tr. vol. 1, 13:2-19; 14:17-15:9; 75:13-17, Dec. 21, 2015, ECF No. 74; Trial Exs. 29, 34.)   Amendments for these other leases were signed by Ellis, "David B. Harding, Vice President," and "Jay A. Shaw, Senior Vice President."   (Trial Exs. 30, 31, 32, 6.)

24.   BVT tries to distinguish between the authority of Harding and Shaw despite both having the title of "Vice President."   Specifically, Ellis testified that Harding was formally appointed Vice President by the Board; Shaw was not. (Trial Tr. vol. 1, 76:13-24, Dec. 21, 2015, ECF No. 74.)   Ellis

admits, however, that BVT never communicated this distinction to Sleepy's.  (Id. at 76:24-77:6.)

25.  Mindful that the Nonrenewal Notice deadline for the Lease was May 30, 2013, Rita Pendergast emailed Acker on April 30, 2013 asking if he wanted to speak to Shaw regarding the Lease.  (Trial Ex. 11; Trial Tr. vol. 2, 109:13-110:19, Dec. 22, 2015, ECF No. 75.)  Acker responded affirmatively.  (Id.)

26.  Shaw did not want Sleepy's to give Nonrenewal Notice because Sleepy's was a good tenant and Shaw wanted them to renew their Lease.  (Trial Tr. vol. 2, 29:25-30:4, Dec. 22, 2015, ECF No. 75.)  To that end, he engaged in negotiations with Sleepy's over the terms of a new lease.  (Id. at 30:5-11.)  Without these ongoing negotiations, Shaw admits that Sleepy's would have sent the Nonrenewal Notice and vacated the Premises.  (Id. at 30:12-14.)

27.  On May 7, 2013 and May 10, 2013, Acker and Shaw discussed the upcoming renewal option by telephone.  (Trial Tr. vol. 2, 111:10-112:5, Dec. 22, 2015, ECF No. 75; Trial Exs. 12, 14.)

28.  As part of a weekly memorandum Shaw sent to Ellis on May 13, 2013, titled "Outstanding Items 5/6-10/2013," Shaw noted, among other things, Sleepy's Nonrenewal Notice deadline of "5/31/2013."  (Trial Ex. 15.)

29. During their negotiations, Shaw and Acker reached an agreement to extend the Nonrenewal Notice deadline in the Lease by thirty days. (Trial Tr. vol. 2, 84:16-85:5; 112:3-18; 116:10-20, Dec. 22, 2015, ECF No. 75.) They agreed to this extension so that they could have more time to negotiate a new lease. (Id. at 112:12-18.)

30. On May 29, 2013, at the direction of Acker, Pendergast emailed Shaw stating: "Jay, As per your conversation with David Acker this email is to confirm the extension of notice period for the above listed locations [Cranston, RI] to June 30, 2013. Please confirm." (Trial Ex. 16; Trial Tr. vol. 2, 94:22-95:1; 115:14-116:19, Dec. 22, 2015, ECF No. 75.)

31. On May 30, 2013, Shaw replied in an email stating, "Documentation to follow from David Burns in legal. Can you send me asap, schedule C specs that details LL work required for North Adams Sleepy's relocation[?]" (Trial Ex. 16.)

32. Acker interpreted this email as confirmation of the change of the Nonrenewal Notice deadline to June 30, 2013 for the Premises. (Trial Tr. vol. 2, 117:12-13, Dec. 22, 2015, ECF No. 75.) Shaw's request for "schedule C specs" related to another property. (Id. at 118:21-119:1.)

33. Acker relied on this email, along with the conversations and discussions he had with Shaw, in deciding not

to submit a Nonrenewal Notice by the May 30, 2013 deadline. (Trial Tr. vol. 2, 84:16-85:5, Dec. 22, 2015, ECF No. 75.)

34. Shaw did not have express authority from Ellis to extend the Nonrenewal Notice deadline. (Trial Tr. vol. 2, 12:1-13; 14:20-25; Trial Tr. vol. 1, 34:23-35:2, Dec. 21, 2015, ECF No. 74.) But Shaw did not tell Acker this. (Trial Tr. vol. 2, 116:14-20, Dec. 22, 2015, ECF No. 75.) Nor did Shaw tell Sleepy's that BVT refused to extend the Notice period. (Id. 40:3-6.)

35. After May 30, 2013, the parties continued negotiations surrounding the Lease. (See id. 40:8-9; 41:21-44:3.) During these negotiations, BVT never notified Sleepy's that the Lease had automatically renewed. (Id. 40:16-25, 45:17-20; see Trial Tr. vol. 1, 31:15-32:10, Dec. 21, 2015, ECF No. 74; Trial Ex. 22.)

36. On June 3, 2013, Shaw traveled to Hicksville, New York to meet with Acker regarding the Lease. (Trial Tr. vol. 2, 43:11-45:13, Dec. 22, 2015, ECF No. 75.) At the meeting, Shaw and Acker discussed the possibility of changing the tenancy to month-to-month status. (Id. 119:8-18)

37. Acker believed converting the Lease to a month-to-month tenancy would allow the parties to continue their negotiations. (See id. 119:11-18; 123:9-23.) It gave the parties more flexibility and would mean that they would not have

to be concerned about deadlines at the end of every month. (Id.)

38.  On June 25, 2013, Pendergast, on behalf of Acker, sent an email to Lois Crawford, a secretary at First Hartford, in which Pendergast asked, "Please confirm that we agree to amend our obligation at the above listed location[] [Cranston, RI] on a month to month basis." (Trial Ex. 19; Trial Tr. vol 2, 88:13-16; 95:2-20, Dec. 22, 2015, ECF No. 75.)  Receiving no response, Pendergast sent a follow up email to Crawford and Shaw on June 27, 2013, in which she asked "Can you please confirm this via email? Our notice is due on Sunday, otherwise I will have to send the notice today.  Email confirmation will work for us." (Id.)

39.  Shaw orally confirmed the month-to-month status of the Lease during a telephone conversation with Pendergast on June 28, 2013.  (Trial Ex. 20; Trial Tr. vol. 2, 136:20-137:22, Dec. 22, 2015, ECF No. 75.)

40.  When Shaw did not respond in writing, Pendergast sent him another email stating, "Jay, we still have not received anything.  Please confirm via email."  (Trial Ex. 19.)  Shaw responded with a single sentence:  "Rita[,] The month to month lease status for Cranston and north adams is confirmed."  (Id.) Shaw intended Sleepy's to rely on this email.  (Trial Tr. vol. 2, 50:11-51:20, Dec. 22, 2015, ECF No. 75.)

12

41.   On July 1, 2013, Shaw included a note in his "Weekly Update" memo to Ellis stating "Sleepy's Month to month leases for Cranston, North Adams, Jeff Carlson." (Trial Ex. 21.)

42.   Shaw did not have actual authority to amend the Lease to change Sleepy's tenancy to month-to-month status. (Trial Tr. Vol. 1, 35:3-6, Dec. 21, 2015, ECF No. 74; Trial Tr. vol. 2, 12:1-13; 21:18-19, Dec. 22, 2015, ECF No. 75.)

43.   However, Acker believed that Shaw had the authority to agree to the month-to-month status change. (Trial Tr. vol. 2, 121:5-20, Dec. 22, 2015, ECF No. 75.) Thus, Acker did not send a Nonrenewal Notice on June 30, 2013 because he was satisfied with Shaw's representations in the email. (Id. 90:5-11.)

44.   Despite the representations in Shaw's emails, on July 8, 2013, BVT notified Sleepy's by letter that "the Lease term will be extended until November 30, 2018" because Sleepy's "has not provided [BVT] with 6 months' advance written notice to elect to permit the Lease term expire [sic] on November 30, 2013 . . . ." (Trial Ex. 22.) According to the letter, the "deadline for this notice was May 30, 2013." (Id.)

45.   Acker was very surprised when he received BVT's letter. (Trial Tr. vol. 2, 124:13-16, Dec. 22, 2015, ECF No. 75.) He contacted BVT and discussed the letter with Ellis. (Id. 124:18-125:11.) Acker told Ellis of the existence of an

13

agreement with Shaw regarding the month-to-month tenancy, which Ellis disputed. (Id.)

46.  On July 16, 2013, Sleepy's sent a letter, by certified mail, to Ellis and Carlson, the individuals required to receive notice under the Lease, stating that Sleepy's was terminating the Lease as of August 31, 2013. (Trial Ex. 24.)  In pertinent part, the letter stated, "[b]y this letter Tenant hereby informs Landlord, pursuant to e-mail dated June 28, 2013, of Tenant's thirty (30) day notice to terminate the Lease.  Therefore, the term of the Lease will expire on August 31, 2013." (Id.)

47.  On August 28, 2013, Sleepy's sent a letter to Ellis, with a copy to Carlson, enclosing the keys to the Premises. (Trial Ex. 25.)   With the letter, Sleepy's delivered the Premises to BVT. (Id.)

II.  Conclusions of Law

The legal issues presented to the Court at trial and in the parties' pre-trial and post-trial memoranda are relatively straightforward.  BVT advances a basic breach of contract claim. In it, BVT argues that because Sleepy's failed to submit its Nonrenewal Notice by May 30, 2013, the Lease automatically renewed for another five years, until November 30, 2018. According to BVT, Sleepy's then breached the renewed Lease when it surrendered the Premises in August 2013 and stopped paying rent.   Sleepy's counters with both contract and equitable

defenses.   First, Sleepy's argues that its admitted failure to send the Nonrenewal Notice did not result in the Lease's renewal because BVT, through Shaw, amended the Lease.   And in any event, Sleepy's argues that the doctrine of promissory estoppel prevents BVT from arguing the Lease renewed for another five years.

A.   Shaw as an Agent of BVT

The Court begins by analyzing Shaw's agency relationship with BVT.   The parties hotly dispute whether Shaw had any authority to amend or waive provisions in the Lease, a disputed fact that is essential to each of the arguments advanced by the parties.

Rhode Island law recognizes an agency relationship "based upon either actual authority or apparent authority." Commercial Associates v. Tilcon Gammino, Inc., 998 F.2d 1092, 1099 (1st Cir. 1993) (citation omitted).   Actual authority "requires evidence of an actual understanding between the principal and agent that the latter is to act on behalf of the former." Id. Both Shaw and Ellis testified that Ellis, the principal, never bestowed authority to amend the Lease on Shaw; Ellis retained that authority.   (Trial Tr. vol. 1, 34:23-35:2, Dec. 21, 2015, ECF No. 74; Trial Tr. vol. 2, 12:1-13, Dec. 22, 2015, ECF No. 75.)   Consequently, Shaw did not have actual authority to amend Sleepy's Lease.

15

But Shaw's apparent authority is a different matter. Apparent authority "arises from the principal's manifestation of such authority to the party with whom the agent contracts." Menard & Co. Masonry Bldg. Contractors v. Marshall Bldg. Sys., Inc., 539 A.2d 523, 526 (R.I. 1988) (citing Restatement (Second) of Agency § 8 (1958)). This manifestation of authority, however, "need not be in the form of a direct communication to the third person." Id. Instead, "[t]he information received by the third person may come from other indicia of authority given by the principal to the agent . . . ." Id. For example, a principal can cloak an individual with apparent authority by giving the person a position with generally recognized duties, see Haviland v. Simmons, 45 A.3d 1246, 1260 (R.I. 2012), or by allowing a person to act in ways that give the appearance that the person has authority, see Petrone v. Davis, 373 A.2d 485, 487–88 (R.I. 1977).[2]

---

[2] Apparent authority also requires that "[t]he third person with whom the agent contracts . . . believe that the agent has the authority to bind its principal to the contract." Menard & Co. Masonry Bldg. Contractors v. Marshall Bldg. Sys., Inc., 539 A.2d 523, 526 (R.I. 1988) (citing Restatement (Second) Agency § 8, comment a at 30-31). And that belief must be reasonable. Commercial Associates v. Tilcon Gammino, Inc., 998 F.2d 1092, 1099 (1st Cir. 1993) (citing Rodrigues v. Miriam Hosp., 623 A.2d 456 (R.I. 1993); Restatement (Second) of Agency § 267). As detailed infra, Sleepy's believed that Shaw had authority to make the agreements at issue and its belief was reasonable. (See Section B.)

Here, it is clear that Ellis and BVT, at a minimum, cloaked Shaw with apparent authority.  First, they allowed Shaw to hold himself out as First Hartford's "Senior Vice President and Director of Leasing," a title that certainly conveys authority to negotiate and amend property leases.  (See Trial Tr. vol. 2, 10:6-12, Dec. 22, 2015, ECF No. 75.)  Further, BVT admits that Shaw was Sleepy's primary contact throughout the term of the Lease.  (Trial Tr. vol. 2, 24:22-23, Dec. 22, 2015, ECF No. 75.) He solicited Sleepy's to fill the retail space and engaged in "ongoing negotiations" with Sleepy's during the Lease term. (Trial Tr. vol. 1, 47:2-7, Dec. 21, 2015, ECF No. 74; Trial Tr. vol. 2, 10:16-11:1, Dec. 22, 2015, ECF No. 75.)  And if that was not enough to establish Shaw's apparent authority, at least after January 2009, BVT held out Shaw as having actual authority to amend and waive lease provisions.  (See Trial Ex. 6.)  It was at this time that Shaw's name and signature appeared at the bottom of a letter amending the Lease.[3]  (Id.)

BVT argues, rather incredibly, that the Court should overlook this evidence because "[t]he only individual with [authority to amend or agree to amend any lease] was Neil

---

[3]   According to Ellis, he instructed his secretary to sign Shaw's name instead of his own.  (Trial Tr. vol. 1, 21:2-10; 49:1-9, Dec. 21, 2015, ECF No. 74.)  This testimony reinforces the conclusion that BVT cloaked Shaw with apparent authority. Ellis, BVT's principal, admits that he held Shaw out as someone capable of amending not just one, but multiple leases on behalf of BVT.

Ellis." (Pl.'s Pre-trial Mem. 31, ECF No. 35.) While this may have been the understanding between Ellis and Shaw, it certainly was not what Ellis and Shaw projected to Acker and Sleepy's. Shaw's title, his admission that he engaged in ongoing negotiations with Sleepy's, and his signature appearing on amendments to the Lease more than suffices for the Court to conclude that Shaw had apparent authority to negotiate, amend, and waive lease provisions on behalf of BVT.

B. Promissory Estoppel

Whether or not Shaw's assurances amended or modified the Lease presents a close call. However, the Court need not decide the issues because Sleepy's easily prevails on its promissory estoppel defense.

Under Rhode Island law, promissory estoppel claims lie where (1) one party has made a clear and unambiguous promise; (2) a second party reasonably and justifiably relies upon that promise; and (3) the second party's reliance on the promise causes it a detriment. Filippi v. Filippi, 818 A.2d 608, 626 (R.I. 2003). Sleepy's easily satisfies each element.

First, Shaw - through his conversations with Acker, his emails, and his conduct - clearly promised to extend the Lease's Notice deadline and agreed to convert the Lease to a month-to-month tenancy. Shaw's promise to convert the least to a month-to-month tenancy could not be clearer. On June 28, 2013, he

18

emailed Sleepy's with a single sentence:   "The month to month lease status for Cranston . . . is confirmed." (Trial Ex. 19.)

And, while the email evidencing Shaw's promise to extend the Notice period is not as clear, the other evidence introduced at trial leaves no doubt that Shaw unambiguously promised to extend the Notice date from May 30 to June 30, 2013.  On the stand, Acker testified that Shaw orally agreed to the extension during their negotiations in May 2013, a fact corroborated by Pendergast's May 29, 2013 email in which she asked Shaw to confirm his promise.  (See Trial Tr. vol. 2, 84:16-85:5; 112:3-18; 116:10-20, Dec. 22, 2015, ECF No. 75; Trial Ex. 16.)  And if there remained any doubt that Shaw extended the deadline, BVT's conduct dispels it.   Despite Sleepy's not submitting a Nonrenewal Notice on May 30, Shaw readily admits that he continued to negotiate with Sleepy's into the early part of July. (Trial Tr. vol. 2, 40:8-9; 41:21-44:3, Dec. 22, 2015, ECF No. 75.)  If BVT had not extended the Notice deadline, why would it have continued to negotiate with Sleepy's?  Without the extension, the Lease would have automatically renewed and BVT would not have needed to negotiate a new lease.  Thus, considering the totality of the evidence, it is clear that Shaw unambiguously promised to extend the Lease' Notice period by thirty days.

Further, Sleepy's has demonstrated that it reasonably relied on both promises to its detriment. At trial, Acker expressly testified that he relied on them in deciding not to submit Sleepy's Nonrenewal Notice at the original May 30 deadline and the extended June 30 deadline. (Trial Tr. vol. 2, 84:16-85:5; 90:5-11, Dec. 22, 2015, ECF No. 75.) In other words, had Shaw not made the promises, Sleepy's would have submitted its Notice and would not have faced the prospect of being liable for another five years of rent for the Premises.

And, contrary to BVT's assertions, Acker's reliance on Shaw's assurances was reasonable. As noted above, BVT cloaked Shaw with a significant amount of authority to negotiate lease terms on its behalf. Shaw was, after all, the Director of Leasing, Sleepy's primary point of contact during lease negotiations, and even signed formal lease amendments. These interactions support Acker's belief that he could rely on Shaw's promise to extend the Notice period and convert the Lease into a month-to-month tenancy, at least while negotiations surrounding the Lease were ongoing.

BVT advances two arguments to defeat Sleepy's promissory estoppel claim. First, it argues that Sleepy's reliance on Shaw's emails was unreasonable because, in the past, the parties had consistently amended the Lease through a type-written

20

document signed by Ellis and Acker.[4]    This argument is
unpersuasive.    For starters, even if this was true, as just
noted, Shaw was responsible for negotiating the lease provisions
that BVT ultimately reduced to writing; nothing in the record
suggests that Shaw's two promises ventured beyond the authority
he exuded during these negotiations.    Indeed, as Acker
testified, throughout his interactions with Shaw, Shaw always
made good on his promises.    (Trial Tr. vol. 2, 121:8-10, Dec.
22, 2015, ECF No. 75.)    Further, contrary to BVT's assertions,
the parties did not pursue a consistent course of conduct when
amending the Lease.    Though the parties seemed to create formal
amendments through type-written documents, the documents (1)
took multiple forms (compare Trial Ex. 3 with Trial Ex. 6 with
Trial Ex. 9 with Trial Ex. 10 with Trial Ex. 31 with Trial Ex.
32); (2) were signed by various individuals on the part of BVT

---

[4]    BVT also argues that Acker's reliance on Shaw's
assurances was unreasonable because Shaw suffered from
Parkinson's disease.    According to BVT, because the disease's
"cognitive symptoms were clearly displayed during Mr. Shaw's
testimony on December 22, 2015," Sleepy's should have been on
notice in 2013 that it could not "justifiably or reasonably
believe that Mr. Shaw had authority to bind BVT."    (Pl.'s Post-
Trial Mem. 2-3, ECF No. 68.)    This argument is absurd.    Although
Shaw testified that he had Parkinson's disease in 2013, BVT did
not submit any evidence to verify his condition at that time.
Consequently, there is no evidence to support BVT's argument
that a third party like Acker would have even known that Shaw
suffered from the disease in 2013, much less that his condition
was so advanced that Acker should have questioned whether
Sleepy's could rely on Shaw's assurances.

(compare Trial Ex. 10 with Trial Ex. 31); (3) were sometimes only signed by one of the parties (see Trial Ex. 10); and (4) were sometimes transmitted electronically via email or fax (see Trial Ex. 38). All of this is to say that Sleepy's reasonably relied on Shaw's promises even though they were not type-written documents that followed BVT's technical interpretation of the Lease's Modification Provision.

Nor does BVT's second argument – that Shaw's assurances were part of ongoing negotiations surrounding the Lease – defeat Sleepy's promissory estoppel claim. To be sure, promissory estoppel cannot rest upon preliminary negotiations or a mere agreement to negotiate the terms of a contract. See B.M.L. Corp. v. Greater Providence Deposit Corp., 495 A.2d 675, 677 (R.I. 1985). Here, as both parties admit, between early May and July 2013, Shaw and Acker were actively negotiating terms of a new lease. But this does not mean that BVT and Sleepy's were also still negotiating the extension of the Notice deadline and the month-to-month tenancy for the existing Lease. As detailed above, Shaw made the two promises to induce Sleepy's to continue negotiating a new lease. Thus, both the Notice extension and month-to-month tenancy were agreements between BVT and Sleepy's separate and apart from the ongoing negotiations surrounding a new lease. They were not, themselves, subject to ongoing

22

negotiations and do not defeat Sleepy's promissory estoppel claim.

Ample evidence supports the conclusion that Sleepy's reasonably relied on Shaw's promises to its detriment. Sleepy's sustains its promissory estoppel defense and for this reason Sleepy's is entitled to judgment in its favor.

III. Conclusion

For the foregoing reasons, BVT's claims against Sleepy's fail. Judgment shall enter in favor of Sleepy's, but the Judgment shall not be final until all issues surrounding attorney's fees and costs are resolved. Therefore, Sleepy's has thirty (30) days to file a petition for fees and costs. If Sleepy's files a petition, final judgment shall enter after the Court rules on Sleepy's petition. If Sleepy's does not file a petition within thirty (30) days, judgment shall become final.

IT IS SO ORDERED.

_____

William E. Smith
Chief Judge
Date:  September 7, 2016